**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

In re:                                                                        Case No. 22-55-ELG

ENOVATIONAL CORP.                                          (Chapter 11)

               Debtor.

_____/

                                                                               Adversary Proceeding No. 22-10014-ELG

ENOVATIONAL CORP.

               Plaintiff,

v.

THE STATE OF MARYLAND

               Defendant.

### MOTION FOR PARTIAL SUMMARY JUDGMENT

Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for Enovational Corp.*

## <u>TABLE OF CONTENTS</u>

I.      Introduction ........................................................................................................... 1

II.     Standard ................................................................................................................ 2

III.    Facts Not Subject to Genuine Dispute ................................................................. 3

        a.  Invoice 569 ................................................................................................. 5

        b.  Invoice 587 ................................................................................................. 7

        c.  Invoice 600 ................................................................................................. 9

        d.  Invoice 601 ............................................................................................... 11

IV.     Argument ............................................................................................................ 12

        a.  Elements of Recovery ............................................................................... 12

        b.  Invoice 569: Quantum Meruit ................................................................... 13

        c.  Invoice 587: Breach of Contract .............................................................. 15

        d.  Invoice 587: Quantum Meruit ................................................................... 17

        e.  Invoice 600: Breach of Contract / Quantum Meruit ................................ 19

        f.  Invoice 601: Quantum Meruit ................................................................... 20

V.      Conclusion .......................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................................ 3

*Asibem Assoc., Ltd. v. Rill*,
286 A.2d 160 (Md. 1972) .............................................................................................. 12

*Associated Indus. Ins. Co. v. Mt. Hawley Ins. Co.*,
2021 WL 1921016 (S.D. Cal. 2021) ............................................................................... 3

*Boyd v. Farrin*,
958 F. Supp. 2d 232 (D.D.C. 2013) ........................................................... 13, 14, 19, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................................ 3

*Continental Masonry Co., Inc. v. Verdel Const. Co., Inc.*,
369 A.2d 566 (Md. 1977) .............................................................................................. 12

*Diamond v. Atwood*,
43 F.3d 1538 (D.C. Cir. 1995) ....................................................................................... 3

*Envelope Co. v. Balto. Post Co.*,
163 A. 688 (Md. 1933) .................................................................................................. 13

*Estrada v. Potomac Elec. Power Co.*,
488 A.2d 1359 (D.C. 1985) .......................................................................................... 13

*Folksamerica Reinsurance Co. v. Republic Ins. Co.*,
2004 WL 1043086 (S.D.N.Y. 2004) ............................................................................... 3

*Gilbert Const. Co. v. Gross*,
129 A.2d 518 (Md. 1957) .............................................................................................. 13

*Harbor Ins. Co. v. Schnabel Found. Co., Inc.*,
946 F.2d 930 (D.C. Cir. 1991) ...................................................................................... 20

*Henke v. U.S. Dep't of Commerce*,
83 F.3d 1445 (D.C. Cir. 1996) ...................................................................................... 17

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) ........................................................................................ 3

*Hooton v. Kenneth B. Mumaw Plumbing & Heating Co., Inc.*,
318 A.2d 514 (Md. 1974) .............................................................................................. 12

*In re Gaston & Snow*,
243 F.3d 599 (2d Cir. 2001) ................................................................................. 13

*In re Salas*,
2018 WL 4621930 (Bankr. D.D.C. Sept. 24, 2018) ............................................. 13

*Mallis v. Faraclas*,
200 A.2d 676 (Md. 1964) ..................................................................................... 13

*Mayorga v. Merdon*,
928 F.3d 84 (D.C. Cir. 2019) ................................................................................. 3

*Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*,
808 F.2d 76 (D.C. Cir. 1987) ............................................................................... 20

*Ponder v. Chase Home Fin., LLC*,
666 F. Supp. 2d 45 (D.D.C. 2009) ....................................................................... 17

*Rotwein v. Bogart*,
177 A.2d 258 (Md. 1962) ..................................................................................... 12

*San Carlos Irrigation & Drainage District v. United States*,
877 F.2d 957 (Fed. Cir. 1989) ............................................................................. 12

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ................................................................................. 3

*Taylor v. NationsBank, N.A.*,
776 A.2d 645 (Md. 2001) .......................................................................... 12, 16, 20

*Tsintolas Realty Co. v. Mendez*,
984 A.2d 181 (D.C. 2009) ............................................................................ 12, 16

*United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*,
81 F.3d 240 (D.C. Cir. 1996) ............................................................................... 13

*Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*,
133 F.Supp.2d 9 (D.D.C. 2001) ........................................................................... 17

*Wyoming Outdoor Council v. Dombeck*,
148 F.Supp.2d 1 (D.D.C. 2001) ............................................................................. 3

**Other Authorities**
*Excerpts from Interview with Nixon About Domestic Effects of Indochina War*, N.Y. TIMES, May
20, 1977, at A16 ................................................................................................... 18

iii

**Rules**

Federal Ruke of Bankruptcy Procedure 7056 ............................................................................. 1, 2

Federal Rule of Civil Procedure 54 ............................................................................. 22

Federal Rule of Civil Procedure 56 ............................................................................. 1

Federal Rule of Civil Procedure 58 ............................................................................. 22

Local Rule 7056-1............................................................................. 1

Local Rule 9013-1............................................................................. 1

Comes now Enovational Corp. ("Enovational" or the "Debtor"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 7056, Federal Rule of Civil Procedure 56, Local Rule 7056-1, and Local Rule 9013-1, and moves for summary judgment on Counts VIII and XV-XIX (though only as to part of the relief sought in Counts XV-XIX) of Enovational's Complaint (the "Complaint," as found at DE #1) and in support thereof states as follows:

## I.      Introduction

Nearly two years after Enovational sought bankruptcy relief, the State of Maryland still refuses to pay the overwhelming majority of the debts that forced a once-proud technology company into Chapter 11. Priority creditors have been paid in full and general unsecured creditors have received large interim payments, but there are still millions upon millions of dollars due to Schedule F claimants. And while this paradigm borders on absurdity for myriad reasons, one stands out as being particularly notable: Maryland does not appear to have any viable defense to claims rooted in the non-payment of several invoices.

For want of ambiguity, Enovational believes it is owed every penny of every single invoice that underlies this litigation. But as creditors continue to await further payment with the patience of a Washington football fan, the Debtor thinks it appropriate to seek prompt judgment on certain obligations that are particularly noteworthy insofar as their elemental composition, coupled with the undisputed factual record, does not invite a need for any further discovery or delay.

Accordingly, this motion (the "Motion") is focused on four specific invoices subsumed within the Complaint: (i) Invoice 569 ("Invoice 569"), directed to the Maryland Medical Cannabis Commission ("MMCC"), in the sum of $1,817,375.70; (ii) Invoice 587 ("Invoice 587"), directed to the Maryland Department of Health ("MDH"), in the sum of $625,000.00; (iii) Invoice 600

1

("Invoice 600"), directed to the Maryland State Department of Assessments and Taxation ("SDAT"), in the amount of $205,000.00; and (iv) Invoice 601 ("Invoice 601"), directed to the Maryland Department of Agriculture ("MDA"), in the amount of $912,227.05.

As demonstrated *infra*, the facts surrounding each of these invoices are plain, with the material portions of such facts not being subject to any genuine dispute. It is thusly urged summary judgment be entered on these fronts, in the interests of infusing funds into the Debtor's estate, focusing the residue of this litigation, and compelling the State of Maryland to pay debts that long ago came due.

## II.    Standard

The standard for a motion seeking summary judgment is familiarly set forth in the Federal Rules of Civil Procedure:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). *See also* Fed. R. Bankr. P. 7056 (making Rule 56 applicable to adversary proceedings).

As noted by the United States District Court for the District of Columbia, of the rule governing summary judgment:

> Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. To determine what facts are "material," a court must look to the substantive law on which each claim rests. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.
>
> In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. However, a nonmoving party must establish more than "the mere existence of a scintilla of

2

evidence" in support of its position. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial." By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.

*Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); quoting *Anderson*, 477 U.S. at 255; *Celotex*, 477 U.S. at 325).

As observed by the United States Court of Appeals for the District of Columbia Circuit, "[a] fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). *See also*, *Folksamerica Reinsurance Co. v. Republic Ins. Co.*, 2004 WL 1043086, at *2 (S.D.N.Y. 2004) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment."); *Associated Indus. Ins. Co. v. Mt. Hawley Ins. Co*., 2021 WL 1921016, at *3 (S.D. Cal. 2021) ("Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.") (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)).

### III.    Facts Not Subject to Genuine Dispute

1.    Enovational formerly operated a technology-centric government solutions provider, providing form-based interfaces for citizen-facing government actors. *See* Affidavit of Vlad Enache ("Enache Aff."), attached hereto as Exhibit A ("Ex. A"), at ¶ 3.

2.      After initially working with Maryland a subcontractor, Enovational and the state entered into a Consulting and Technical Services+ Contract (the "CATS+ Contract") on or about July 17, 2019. *See* CATS+ Contract, attached hereto as Exhibit B ("Ex. B").

3.      The CATS+ Contract does not actually mandate Enovational undertake any work or that the State of Maryland compensate Enovational for any work; rather, as noted in the underlying request for proposals (the "CATS+ RFP"), "[t]he Master Contracts awarded as a result of this solicitation will provide the State with the flexible means of obtaining IT resources quickly and efficiently through the issuance of Task Order Requests for Proposals (TORFP) or Requests for Resumes (RFR) specific to its needs. . ." CATS+ RFP, attached hereto as Exhibit C ("Ex. C"), at § 1.1.1.

4.      The CATS+ RFP goes on to further provide that when work is directed to Enovational, such will be through a task order (a "TO"):[1]

> Specific TORFPs or RFRs will be issued, as needed, throughout the term of the Master Contact. All eligible Master Contractors will be invited to compete. Based on the evaluation of responses, and as specified in the TORFP/RFR, a single or multiple Master Contractor(s) will be selected for award. A specific TO Agreement will then be entered into between the State and the selected Master Contractor(s), which will bind the Master Contractor(s) to the contents of its Proposal, including its price. A TORFP, RFR, TO Agreement, or Proposal may not in any way conflict with or supersede the CATS+ Master Contract. . .

CATS+ RFP, Ex. C, at § 1.1.3.

5.      Per the express terms of the CATS+ Contract, the provisions of the CATS+ RFP control over all other documents. *See* CATS+ Contract, Ex. B, at § 2.1.

---

[1] Through absolutely no fault of Maryland's, the universe of acronyms used (i) by state agencies; (ii) for agency projects; (iii) in the CATS+ Contract; (iv) in the CATS+ RFP; and (v) elsewhere, is broad, expansive, and often frustrating. A number of items are defined in this motion; notwithstanding such allowing those terms to be abbreviated, the terms themselves are also often used, sans abbreviations, in the simple interest of avoiding confusion. No one benefits from a summary judgment motion that needs an accompanying glossary.

6.      The scope of services to be performed pursuant to the CATS+ Contract is, in turn, defined as being that "described in section 2 of the [CATS+ RFP], the TO Agreement, and the [Task Order Request for Proposals]/[Request for Resume]." CATS+ Contract, Ex. B, at § 2.1.

7.      Payment for work under the CATS+ Contract is governed by the terms of the specific task orders: ". . .the State shall pay the Contractor in accordance with the rates established in the Contractor's TO/RFR Proposal which may not exceed the rates and terms of Exhibit F, Contractor's Financial Proposal." CATS+ Contract, Ex. B, at § 4.2.

8.      More simply summarized: The CATS+ Contract allows Maryland to engage Enovational to perform work; the specific work, however, must be given through task orders; and there is no work actually assigned directly through the CATS+ Contract. *See, supra*, ¶¶ 3-7.

**Invoice 569**

9.      In 2020, Maryland and Enovational entered into an agreement known as Work Order #3 ("Work Order #3"), pursuant to which Enovational agreed to perform work for the state's cannabis division, the MMCC. *See* Work Order #3, attached hereto as Exhibit D ("Ex. D").

10.     Per its express terms, Work Order #3 only covered efforts through Enovational's work going "live," and did not provide for end-user support following project completion. *Id.*

11.     Maryland signed off on completion of Enovational's contracted work, on April 12, 2021, with the project having publicly launched on February 16, 2021. *See* Closeout Document, attached hereto as Exhibit E.

12.     No new work order or task order was entered into between Enovational and Maryland, for MMCC-centric work, after the conclusion of Work Order #3. Enache Aff., Ex. A, at ¶ 4.

13.    Maryland (through the MMCC), however, continued to ask Enovational to "provide support, solution enhancements, and data management for MMCC beyond the period of performance" of Work Order #3. *See* Maryland Medical Cannabis Commission Invoice Justification, attached hereto as Exhibit F, at p. Enovational001310.[2]

14.    The ongoing efforts of Enovational, after the completion of Work Order #3, included responding to well over 100,000 support requests from citizens and government officials, alike, with approximately 40% of these requests being related to use of the MMCC system constructed by Enovational. *See* List of Support Tickets Handled by Enovational, Exhibit G; MMCC Post-Launch Support Services Report, attached hereto as Exhibit H.

15.    These support tickets included everything from helping ██████████████, a ████████t, who had issues checking in a patient, *Id.* at p. Enovational001863, to ███████, a citizen who needed help submitting the application for her medical marijuana card, *Id.* at p. Enovational001927, to ██████████, who needed support renewing a medical marijuana license, *Id.* at p. Enovational002216.[3]

---

[2] The subject document does not have its own page numbers, so reference is made through the Bates stamp that has been appended thereto during discovery in this case.

[3] It is somewhat concerning that Maryland had Enovational perform support for people with medical-centric issues, without any governing contractual framework, and thereby left a vendor with the names and contact information of citizens alongside information about their use of medical marijuana. There is no contract that governs these records (since there is no contract that governs this work), and there is no protective order in place for these records (since they were already possessed by Enovational pre-litigation). One would surmise Maryland might wish to pay such a vendor, so as to avoid having the subject citizen health information end up on a public docket in connection with a collection case. Maryland, however, has seemingly no such inclination. Nonetheless, Enovational is filing herewith a motion to file Exhibit G under seal, and is redacting citizen names in the public-facing portion of this motion, so as to protect the privacy of Maryland's citizens. Medical marijuana work seems an appropriate field in which to take the high road.

16.    The ongoing efforts of Enovational also included (i) "data management and cleanup efforts;" (ii) "multiple data migrations;" (iii) conducting a data mapping exercise; (iv) providing new features to MMCC; and (v) handling MMCC change requests. *See* Maryland Medical Cannabis Commission Invoice Justification, attached hereto as Exhibit I, at p. Enovational001310-Enovational001311.

17.    In performing work for MMCC after the expiration of Work Order #3, Enovational personnel undertook 11,995 hours of labor, with Enovational also fronting $39,800.91 in direct costs. *See* Enovational MMCC Cost Sheet, attached hereto as Exhibit J.

18.    For these efforts, and seeking reimbursement of these expenses, Enovational conveyed Invoice 569 to Maryland on or about May 27, 2022. *See* Invoice 569, attached hereto as Exhibit K; Enache Aff., Ex. A, at ¶ 5.

19.    Maryland has, at all times since, refused to pay Invoice 569 or any part thereof. Enache Aff., Ex. A, at ¶ 6.

**Invoice 587**

20.    In April 2021, Maryland conveyed to Enovational three fully-executed statements of work, calling for Enovational to undertake work for the Maryland Department of Health ("MDH") programs focused on breast and cervical cancer diagnosis and treatment ("BCCDT"), kidney disease ("KDP"), and children's medical services ("CMS"). *See* MDH Statements of Work, attached hereto as Exhibits L, M, and N.

21.    The statements of work called for Enovational to complete tasks originally entrusted to a separate contractor through that contractor's "Word Order 25," while also asking Enovational to undertake myriad "out of scope" tasks beyond the parameters of that other contractor's prior engagement. *Id.*

22.     The statements of work indicated Enovational would be paid $878,000.00 for the work with BCCDT; $635,000.00 for the work with CMS; and $691,000.00 for the work with KDP. *Id.*

23.     A work order ("Work Order 17") was subsequently entered into, governing the portions of the KDP, CMS and BCCDT work that had been previously subsumed in another contractor's Work Order 25, but Work Order 17 did not include the out-of-scope elements tasked to Enovational through the aforementioned statements of work. *See* Work Order 17, attached hereto as Exhibit O.

24.     As Enovational progressed on these projects, various Maryland officials signed off on the completion of Enovational's work (including all work for which compensation is now sought). *See* Deliverable Acceptances, attached hereto as Exhibits P, Q, R, S, and T.

25.     When Enovational had finished approximately 90% of the tasks called for in the three statements of work, Maryland elected to terminate the BCCDT, KDP, and CMS projects. *See* Maryland BCCDT, CMS, and KDP Invoice 587 Justification (the "Invoice 587 Justification"), attached hereto as Exhibit U; Enache Aff., Ex. A, at ¶ 7.

26.     After Enovational sought bankruptcy protection, Maryland asked Enovational to "suspend work on work order no. 17 immediately," indicating ". . .the State of Maryland will pay Enovational for work performed to date, regardless of the fact that payment under work order no. 17 is conditioned on completion." *See* E-mail from Counsel for Maryland, attached hereto as Exhibit V.

27.     Maryland, recognizing that it could not withhold payment from Enovational on account of the project not being completed, when it was Maryland causing the project to terminate,

conditioned payment only on Enovational "provid[ing] sufficient backup documentation of the work." *Id.*

28.     Thereafter, Enovational furnished backup documentation to Maryland, including the Invoice 587 Justification. Enache Aff., Ex. A, at ¶ 8.

29.     Enovational thereafter conveyed Invoice 587 to Maryland, seeking $625,000.00 for services rendered, including services performed pursuant to the three statements of work but outside the scope of Work Order 17. For want of ambiguity, the invoiced tasks were 100% completed. See Invoice 587, attached hereto as Exhibit W; Enache Aff., Ex. A, at ¶ 9.

30.     Invoice 587 synchronizes to the three work orders, tracking the percentages of completion indicated therein. *Id.*

31.     Maryland has, at all times since, refused to pay Invoice 587 or any part thereof. Enache Aff., Ex. A, at ¶ 10.

**Invoice 600**

32.     On June 16, 2021, Maryland and Enovational entered into Work Order 18. *See* Work Order 18, attached hereto as Exhibit X.

33.     Work Order 18 calls for Enovational to work with SDAT – the state's tax arm – to undertake various projects, delineated by "milestones" at which payment will be made for services rendered. *Id.*

34.     Milestone 1 calls for Enovational to create a renter's tax credit ("RTC") form, with workflow and certificates, to be presented in a test environment and then subjected to testing. *Id.* at p. 8 (Enovational004177).

35.     Enovational completed Milestone 1 and, on June 28, 2022 and June 29, 2022, three SDAT representatives signed off on completion of this work. *See* Sign Off, attached hereto as Exhibit Y.

36.     In lieu of paying for the work completed on Milestone 1, however, SDAT conditioned payment on Enovational placing production-level data (ie, real citizens' information) in a test environment (a largely-unsecured portal).  Enache Aff., Ex. A, at ¶ 11.

37.     Work Order 18 does not require Enovational to place production-level data in a test environment. *See* Work Order 18, attached hereto as Exhibit X.

38.     The State of Maryland Information Technology Security Manual expressly provides, *inter alia*, "[t]he organization is restricted from transmitting and/or using state production-level data within the development environment. The organization must notify the state of data restriction violations within (1) hour of discovery." State of Maryland Information Technology Security Manual, attached hereto as Exhibit P, at p. 198.

39.     In an e-mail sent on September 8, 2022, an SDAT employee noted that "Thor [Gibbons] indicated during our Oversight meeting this morning that he expects [all data for renter's tax credits] to be" in a "Test Environment." *See* E-mail of September 8, 2022, attached hereto as Exhibit Q.

40.     Enovational, aware of its obligation to adhere to the Maryland Information Technology Security Manual (and to not compromise the security of citizen data), refused to place production-level data in a test environment. Enache Aff., Ex. A, at ¶ 12.

41.     On September 12, 2022, Enovational sent Maryland Invoice 600 for work on Milestone 1. *See* Invoice 600, attached hereto as Exhibit R.

42.     Maryland has, at all times since, refused to pay Invoice 600 or any part thereof. Enache Aff., Ex. A, at ¶ 14.

## Invoice 601

43.     On October 3, 2022, Enovational consummated a sale of substantially all of its assets (excepting cash, receivables, and a handful of specifically-delineated items) to a third party. *See* DE #234 in the Main Case.

44.     Approximately 17 days later, Maryland sent Enovational a work order for work Enovational had already done for the Maryland Department of Agriculture. *See* Work Order MDA-E29-2, attached hereto as Exhibit Z; Enache Aff., Ex. A, at ¶ 16.

45.     Inasmuch as Enovational had sold the relevant contractual rights to a third party, and separated nearly all of its employees so they could join that third party, agreeing to not undertake competitive work in the process, Enovational did not sign off on the work order. Enache Aff., Ex. A, at ¶ 17.

46.     This created a familiar paradigm: Enovational had performed $912,227.05 in services for the Maryland Department of Agriculture, without a work order in place. *See* Invoice 601, attached hereto as Exhibit AA.

47.     In fact, Enovational had invoiced Maryland for these services more than a month prior. *Id.*

48.     A significant amount of the work Enovational had undertaken was already being utilized by the public, through Maryland's roll out of such as a citizen-facing product. Enache Aff., Ex. A, at ¶ 18.

49.     Enovational performed all of the work delineated in Invoice 601 yet Maryland has, at all times, refused to pay Invoice 601 or any part thereof. Enache Aff., Ex. A, at ¶ 19.

### IV.    Argument

#### a.    Elements of Recovery

Enovational proceeds in this litigation under three legal theories: (i) breach of contract; (ii) quantum meruit; and (iii) unjust enrichment. Only the first two are implicated in the instant motion. These are each well-settled and veritably familiar causes of action. In lieu of regurgitating the elements of each repetitively, in connection with the discussion of each invoice *infra*, an overarching recitation appears more efficient.

Under District of Columbia law, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (citing *San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).

The CATS+ Contract, however, expressly provides for application of Maryland law. *See* CATS+ Contract, Ex. B, at § 18.2. And Enovational will gladly agree to have its claims for breach of contract considered in the prism of Maryland law, as opposed to District of Columbia law, since the Old Line State has a notably lower threshold:

> . . . a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation. It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages.

*Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001) (citing *Continental Masonry Co., Inc. v. Verdel Const. Co., Inc.*, 369 A.2d 566, 569 (Md. 1977); *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co., Inc.*, 318 A.2d 514, 518 (Md. 1974); *Asibem Assoc., Ltd. v. Rill*, 286 A.2d 160, 162 (Md. 1972); *Rotwein v. Bogart*, 177 A.2d 258, 260 (Md. 1962); *Gilbert Const. Co. v. Gross*,

129 A.2d 518, 523 (Md. 1957); *Envelope Co. v. Balto. Post Co.*, 163 A. 688, 692 (Md. 1933);

*Mallis v. Faraclas*, 200 A.2d 676, 680 (Md. 1964)).

For the non-contractual claims, District of Columbia law clearly controls since Enovational

was based in Washington, DC and that is the jurisdiction in which this Honorable Court sits. *See*

*In re Salas*, 2018 WL 4621930, at *17 (Bankr. D.D.C. Sept. 24, 2018) (noting the District of

Columbia follows a modified version of the "governmental interest analysis," where "the state

with the 'most significant relationship' should also be that whose policy would be advanced by

application of [its] law.") (quoting *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 n.2

(D.C. 1985)). *See also In re Gaston & Snow*, 243 F.3d 599, 601–02 (2d Cir. 2001) ("Because

federal choice of law rules are a type of federal common law, which federal courts have only a

narrow power to create, we decide that bankruptcy courts confronting state law claims that do not

implicate federal policy concerns should apply the choice of law rules of the forum state.").

Under District of Columbia law, a four criterion must be conjunctively established to make

out a case for quantum meruit recovery:

> To recover on a quantum meruit claim, plaintiffs must prove four elements: "1)
> valuable services rendered by the plaintiff; 2) for the person from whom recovery
> is sought; 3) which services were accepted and enjoyed by that person; and 4) under
> circumstances which reasonably notified the person that the plaintiff, in performing
> such services, expected to be paid."

*Boyd v. Farrin*, 958 F. Supp. 2d 232, 241 (D.D.C. 2013) (citing *United States ex rel. Modern Elec.,*

*Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 246 (D.C. Cir. 1996)).

### b.  Invoice 569: Quantum Meruit

Summary judgment is appropriate on Count VIII of the Complaint because there is no good

faith argument that a contract controls work Enovational undertook outside the scope of Work

Order #3 and long after Work Order #3 expired by its own, express terms. Maryland's cannabis

agency continued to seek – and utilize – the services of Enovational beyond the cognizable scope

of any contractual framework, yet has altogether refused to pay for the tendered services and the advanced costs. This is a classic quantum meruit claim, and it is one where none of the operative facts are subject to genuine dispute.

Applying the *Boyd* factors, Enovational certainly provided valuable services to Maryland. In fact, more than 11,900 hours of time were expended by the Debtor's personnel. And the services rendered included not only "traditional" technology work, such as data migrations and management, but, too, answering well more than 100,000 citizen help tickets (including those of state employees). These were coupled with Enovational incurring $39,800.81 in infrastructure costs as it tended to MMCC's various needs.

As to the second factor, there is equally no question but that the services – and infrastructure costs – were for the State of Maryland. The Defendant is a government actor; Maryland's medical cannabis commission ordered these services from Enovational and used the fruits of these services to interact with its citizenry. These services did not benefit the good people of North Dakota, Nevada, or any other state, nor did these services benefit the government of any other state or municipality – these were services performed expressly for the State of Maryland, using the Defendant's online interface and working with the Defendant's citizens, residents, and consumers.

The third criterion is satisfied with equal ease: Maryland accepted these services. This is evidenced by every single one of the closed help tickets, by the fact that Maryland used Enovational's infrastructure to power the MMCC's online interface, and by the fact that Maryland (and, by extension, Marylanders) benefited from having a functional medical cannabis commission replete with a user-friendly licensing system. This is not a situation where someone wrote a computer code in their basement, placed it on a USB drive, and then randomly mailed the drive to

14

various state actors with aims of getting rich; Maryland engaged Enovational to work with the MMCC when Work Order #3 was executed, and the MMCC continued to ask Enovational's services long after that work order expired.

Vis a vis the fourth mandate, the circumstances of this case are such that Enovational reasonably notified Maryland that the Debtor expects to be paid for the work, services, and infrastructure costs. Enovational never held itself out as a not-for-profit entity, always enjoyed a commercial relationship with Maryland, and rather clearly was not answering over 100,000 help tickets on a *gratis* basis. Maryland well knew – from all of the other work being undertaken by Enovational (including that with a contractual framework) – that payment would be expected. Yet Maryland, for reasons that remain unclear to this day, decided to instead force Enovational into bankruptcy.

The bankruptcy component of this ought not be overlooked, either. Invoice 569 is for $1,817,375.70. Maryland's refusal to pay its debts as they come due has had a cascading and torrential impact on Enovational's entire creditor base, ranging from separated employees who waited more than half a year to receive their final paycheck, to a landlord left holding the proverbial bag on a freshly built-out office complex. Enovational has been able to make plan payments through the sale of its assets, but millions of dollars remain due and owing to creditors. The entry of summary judgment on Count VIII will permit the Debtor to continue ebbing the flow of damages incurred by the creditor base and, in so doing, advance the paramount equities of this case.

### c.  Invoice 587: Breach of Contract

One of the more disturbing aspects of this case emanates from Maryland's refusal to pay for services and goods, even when there was a fully executed contract in place. The state is not merely shirking those obligations for which it failed to formally establish contours through a work

15

order or statement of work; the state is declining to pay debts owed pursuant to its own contracting

process. And Invoice 587 – representing work done for the Maryland Department of Health – is a

prime example of such.

Applying the first *Taylor* factor, it appears there was a contract in place between Maryland

and Enovational, in the form of (i) the three Maryland Department of Health statements of work;

(ii) Work Order 17; and (iii) the May 17, 2022 e-mail from Maryland's counsel. Of course, should

Maryland contend these do not equate to a legally-viable contract, Enovational has also brought

suit on quantum meruit grounds, which are discussed in Section IV(d), *infra*.

Under the agreement, Maryland was obligated to "pay Enovational for work performed to

date, regardless of the fact that payment under work order no. 17 is conditioned on completion."

*See* E-mail from Counsel for Maryland, attached hereto as Exhibit K.

Maryland has breached that duty, insofar as 18 months have now elapsed since an invoice

was presented to the state, with no payment having been made for the services delineated therein.

And, to be sure, Enovational did not merely present an invoice; as noted *supra*, Enovational also

presented a detailed justification of the services provided, so as to comply with Maryland's demand

that "Enovational must provide sufficient backup documentation of the work. . ." *See* E-mail from

Counsel for Maryland, attached hereto as Exhibit K; Invoice 587 Justification, attached hereto as

Exhibit J.

Even if this Honorable Court were to apply the District of Columbia standard set forth by

the *Tsintolas* Court, and introduce a final element of damages (which is expressly *not* required

under *Taylor*), Enovational has sustained damages in direct proportion to the monies not paid.

These total $625,000.00, as evidenced by Invoice 587.

### d.  Invoice 587: Quantum Meruit

Given that Maryland never reduced portions of the three Department of Health statements of work into an actual work order, it is recognized that part – or all – of Invoice 587 may not be contractual in nature. In recognition of such, Enovational also seeks summary judgment on its claim for quantum meruit. If it appears odd that the Debtor seeks summary judgment on two theories of recovery otherwise pleaded in the alternative, such is a direct byproduct of the Kafkaesque government contracting universe administered by the State of Maryland, wherein (i) work is expected to begin before work orders are executed; (ii) work orders are sometimes never executed; (iii) work orders do not mirror statements of work; and (iv) economically-beholden contractors undertake jobs on the misplaced assumption that a sovereign state would not inequitably deny them payment for services rendered.

Enovational maintains the statements of work for the three MDH projects are, as a matter of law, contracts. Relevantly, "[t]he essential elements of a contract are 'competent parties, lawful subject matter, legal consideration, mutuality of assent and mutuality of obligation.' Under D.C. law, there must be agreement as to all material terms and there must be an intention of the parties to be bound." *Ponder v. Chase Home Fin., LLC*, 666 F. Supp. 2d 45, 48 (D.D.C. 2009) (citing *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F.Supp.2d 9, 17 (D.D.C. 2001); quoting *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996)).

From a legal perspective, Enovational and Maryland are – and were – each a "competent" party. While Enovational certainly suggests a significant degree of governmental ineptitude in this case, there is no contention that a constituent state of the union is *non compos mentis*. And the same is assuredly true of Enovational, a validly-formed corporation in good standing at all times relevant.

Equally, the provision of government contracting services is certainly a "lawful subject matter." In fact, insofar as the work in question was expressly ordered by the government, it is arguably lawful per se. *See, e.g.*, *Excerpts from Interview with Nixon About Domestic Effects of Indochina War*, N.Y. TIMES, May 20, 1977, at A16 (". . .when the President does it, that means that it is not illegal"). More pertinently, though, there is no assertion in the record that Enovational ever undertook any work of an unlawful nature, and public health work would appear to be the epitome of lawful work.

In terms of "legal consideration," the statements of work call for Enovational to furnish consideration in the way of services and goods, while calling for Maryland to furnish consideration in the way of currency. Both of these are paramount exemplars of "legal consideration." And, skipping ahead one element, these also establish a mutuality of obligation.

This leaves only the questions of mutuality of assent and an intent to be bound. Maryland sent statements of work – signed by various dignitaries – to Enovational; Enovational received these statements of work and commenced performing the tasks enumerated therein. While Maryland has a now-notorious track record of asking Enovational to perform tasks and then, later, indicating that the state did not ever really mean to suggest it would pay for such, the record herein makes it impossible to surmise such was the case with the three MDH statements of work. And for Maryland to assert otherwise (which, upon belief, the state will not), would be for a sovereign state to more or less acknowledge fraudulently inducing a contractor into performing work, all the while harboring no intent of paying the contractor the sums of money promised as an inducement for such work.

To be sure, the statements of work are formally executed documents, signed by the chief of the medical programs, the state's chief technology officer, the deputy secretary of the state's IT

18

division, and a representative of MDH. The signatures are dated. The statements of work are lengthy documents, produced on the state's official letterhead. These are not one sentence e-mails or Post-it notes left on a colleague's desk; there is no genuine construction of these documents other than as formal declarations upon which Maryland intended to be bound.

For these reasons, summary judgment is appropriate on the claim for breach of contract, thereby mooting the claim for quantum meruit. However, should Maryland insist that the portions of the statements of work not subsequently encompassed in Work Order 17 are somehow beyond the purview of a binding contract, quantum meruit recovery is appropriate for those efforts.

Using the *Boyd* elements, the record makes clear that (i) Enovational performed valuable services for Maryland and, more particularly, the state's health department; (ii) Maryland expressly solicited those services through the statements of work; (iii) Maryland received the fruits of Enovational's work even if the state, for reasons unknown, elected to never publicly utilize the byproduct; and (iv) it is enormously inequitable for Maryland to not now pay for those services – especially when it expressly promised, through its counsel, to do so.[4]

### e. Invoice 600: Breach of Contract / Quantum Meruit

Enovational – in express compliance with the State of Maryland Information Technology Security Manual – refused to place sensitive citizen tax data in an unsecure environment. For this sin, the state refused to pay Enovational for the work undertaken for the State Department of Assessments and Taxation, despite Maryland having otherwise received the work and signed off

---

[4] For want of ambiguity, the e-mail from Maryland's counsel is of ultimately no legal moment – Maryland was obligated to pay for Enovational's services in light of the statements of work or, alternatively, under the doctrine of quantum meruit. But the e-mail further establishes the state's cognizance of its obligation, while equally setting forth yet another example of Maryland promising to make good on its debts and then subsequently failing to do so.

on the work. This is a manifest breach of Work Order 18 and summary judgment is accordingly appropriate on the portion of Count XV that covers this work order.

Revisiting the *Taylor* factors, there is no dispute but that Work Order 18 was a valid contract between Enovational and Maryland. Nor is there any dispute but that Maryland was required, thereunder, to pay Enovational as various milestones and tasks subsumed within milestones were completed. Maryland has breached that duty, refusing to pay for task 9 of the first milestone. And, if District of Columbia law is to be applied in lieu of Maryland law, Enovational has been accordingly damaged in the sum of $205,000.00.

### f.  Invoice 601: Quantum Meruit

The United States Court of Appeals for the District of Columbia Circuit defines "chutzpah" as "a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan." *Harbor Ins. Co. v. Schnabel Found. Co., Inc.*, 946 F.2d 930, 937 n. 5 (D.C. Cir. 1991) (citing *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 808 F.2d 76, 83 (D.C. Cir. 1987)). Invoice 601 falls squarely within this doctrine: Maryland did not pay Enovational for services rendered to the state's Department of Agriculture, thereby forcing Enovational into bankruptcy; once in bankruptcy, Enovational sold substantially all of its assets to a third party, agreeing – as part of the sale – to no longer operate in the government contracting space. Weeks later, Maryland finally sent Enovational a work order for all of the efforts that had already been performed. And since Enovational could not execute that work order – having liquidated most of its assets, separated most of its staff, and agreed to no longer dabble in government contracts, all because Maryland forced the entity into bankruptcy – the state has refused to pay Enovational for the work completed.

At core, though, what matters is that the work order was never executed and, as such, there is no contractual framework in place. This brings Invoice 601 firmly within the purview of quantum meruit recovery. Had Maryland not waited until after work was completed to send a work order, there might be a contractual backbone to these efforts. But, alas, Maryland – consistent with a pattern and practice that underlies so much of this case – did not, instead opting to receive the finished product before thinking to suggest ink be spilled on a contract governing that product.

The first *Boyd* factor for quantum meruit recovery is easily satisfied: Enovational performed valuable services. And so, too, follows the second factor: this was work done for the State of Maryland and not for any other government, client, or enterprise. The third factor is addressed with equal ease: not only did Maryland accept the work, but Maryland made a large amount of the finished byproduct available to the state's citizens *before* Enovational even sent the invoice. Vis a vis the fourth factor, it is equally manifest that Enovational intended to be paid for its efforts.

There are a disturbing number of aspects to this case that beget questions about whether Maryland was engaged in nonfeasance, misfeasance or malfeasance. Not paying for the state's COVID-19 vaccine registration system (which, to be sure, is *not* an issue addressed in this brief) is chief amongst those disturbing aspects. So, too, are the actions of the state in promising payment for certain work and then simply refusing to honor those promises, with all the moral fidelity of a debtor insisting the check is in the mail. But, somehow, it is Invoice 601 – covering some of Enovational's work for the Maryland Department of Agriculture – that most vibrantly calls into question how a government actor could so badly botch its own contracting process. Maryland sent the work order for these services not merely after they were completed but, indeed, *after* Maryland forced Enovational into bankruptcy, watched as Enovational consummated an asset sale, and

21

reviewed the terms of that sale – inclusive of a non-compete provision. There is a word for that: chutzpah.

## V.      Conclusion

WHEREFORE, Enovational respectfully prays this Honorable Court (i) enter partial summary judgment on the debts delineated herein; (ii) enter judgment in favor of Enovational, and against the State of Maryland, in the sum of $3,559,602.75, pursuant to Federal Rule of Civil Procedure 54(b) and Federal Rule of Civil Procedure 58(b)(2); and (iii) afford such other and further relief as may be just and proper.

                              Respectfully submitted,

Dated: February 4, 2024        By:    /s/ Maurice B. VerStandig
                                      Maurice B. VerStandig, Esq.
                                      Bar No. MD18071
                                      The Belmont Firm
                                      1050 Connecticut Avenue, NW, Suite 500
                                      Washington, DC 20036
                                      Phone: (202) 991-1101
                                      mac@dcbankruptcy.com
                                      *Counsel for Enovational Corp.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of February, 2024, a copy of the foregoing was served electronically, upon all parties hereto, via this Honorable Court's CM/ECF system.

                              /s/ Maurice B. VerStandig
                              Maurice B. VerStandig